IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| **MICHAEL S SUTTON LIMITED** § | |
| § | |
| **Plaintiffs** § | |
| § | |
| vs. § | **CASE NO. 6:07CV203** |
| § | **PATENT CASE** |
| **NOKIA CORPORATION and NOKIA INC.** § | |
| § | |
| **Defendants** § | |
| § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Nokia Corporation and Nokia Inc.'s (collectively "Nokia") Motion for Partial Summary Judgment on the issues of indefiniteness, enablement, and utility (Docket No. 82) and Nokia's motion to strike the declaration of Dr. Harley Myler (Docket No. 102). After considering the briefing and oral argument, the Court **GRANTS** Nokia's motion for summary judgment and **DENIES** Nokia's motion to strike for the reasons explained below. This opinion also construes the disputed terms in U.S. Patent No. 5,771,238 (the "'238 Patent").

**BACKGROUND**

The '238 patent is entitled "Enhanced One Way Radio Seven Bit Data Network." It generally describes methods and apparatuses for sending and receiving a variety of 8 bit byte messages through radio "paging" networks that have been configured to send and receive only 7 bit byte messages. On April 30, 2007, Michael S. Sutton, Ltd. ("Sutton") filed the present infringement action against Nokia. The parties only seek construction of terms contained within claims 1 and 3 of the '238 patent.

**APPLICABLE LAW**

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *See id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). This intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id*. Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id*. Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive;

it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316.  In these situations, the inventor's lexicography governs. *Id*.  Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325.  But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323.  The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862).  Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318.  Similarly, expert testimony may aid

a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court. *Id*. Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*.

## APPLICATION

*Preambles as limitations*

First, the parties generally dispute whether the preamble to claims 1 and 3 constitute independent limitations. Sutton argues that the preambles merely state a purpose and intended use of the methods described in the remainder of the claims. Nokia asserts that the preamble to claims 1 and 3 constitute independent limitations to the claims. A preamble is generally construed as a limitation if it recites essential structure or steps or if it is necessary to give life, meaning, or vitality to the claim. *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1288 (Fed. Cir. 2008). On the other hand, a preamble is not limiting where a patentee defines a structurally complete invention in the claim body and the preamble is merely used to state a purpose or intended use to the invention. *Id.* The Federal Circuit has indicated the preamble is "generally not limiting" unless there exists "clear reliance on the preamble during prosecution to distinguish the invention from prior art," or the preamble is necessary to form an antecedent basis to the claims. *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808-809 (Fed. Cir. 2002).

The preamble to claim 1 provides:

> A method of preparing a message packet for digital data transmission which enables eight bit data, binary data and control messages to be encapsulated in a 7-bit character packet where one or more of the 7 bit characters are prohibited comprising the steps of . . . .

'238 Patent at 14:35-40. The preamble to claim three recites

> [a] method of receiving an incoming encoded binary message having packets transmitted over a paging network by a selective call receiver which enables the message receiver at a single network address, unmodified paging messages and to selectively accept or reject eight bit data information messages and encoded control messages as well as being able to accept or reject data information messages specified for a specific subchannel (0-255) for which the receiver respectively is or is not currently authorized to accept; for each received packet of an incoming message the method comprising the steps of . . . .

*Id.* at 15:6-16.

As Nokia suggests, several terms find their antecedent basis within the preambles. For instance, step (3) of the method described in claim 1 addresses "assembling the message packet." *Id.* at 14:55. The only location referring to a "message packet" prior to step (3) is the preamble of claim 1. The patentee's reliance upon the preamble to provide antecedent basis is further illustrated in claim 3. Step 1 of claim 3 refers to "the received packet" and "the receiver." *Id.* at 15:17-18. Further, step (7) of claim 3 refers to "the subchannel." *Id.* at 15:33. These three terms clearly refer to their prior introduction within claim 3's preamble. Furthermore, the preamble does not merely state a purpose or intended use of the invention. The entire context of the invention as described in the specification, summary, and background sections of the patent is embodied within the preamble language. *See, e.g., id.* at 1:5-15 (describing the invention as "extend[ing] to 7 bit networks" and "used with a paging system having a transmitter and a plurality of portable selective call receivers (paging receivers)"). To divorce the claims from their preambles would also broaden the scope of the claims far beyond what is described in the specification. *See On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1341 (Fed. Cir. 2006) ("the claims cannot be of broader scope than the invention that is set forth in the specification"); *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73

F.3d 1573, 1581 (Fed. Cir. 1996) (choosing the narrower of two equally plausible claim constructions in order to avoid invalidating the claim). Accordingly, the preambles of claims 1 and 3 limit the claims.

### *Order of method claims*

The parties also dispute whether the steps recited in claims 1 and 3 must be performed in the order they are recited. Sutton argues that the steps may be performed in any order. Nokia contends that the steps must be performed as recited. Generally, "although a method claim necessarily recites the steps of the method in a particular order, as a general rule the claim is not limited to performance of the steps in the order recited, unless the claim explicitly or implicitly requires a specific order." *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1345 (Fed. Cir. 2008). However, "[t]he specification or prosecution history may also require a narrower, order-specific construction of a method claim in some cases." *Id.* The steps required in claim 1 are:

> 1) analysing [sic] a message to be transmitted to ascertain if it is a control message or a data message,
> 2) if a data message,
>     (a) analysing [sic] it to determine if it can be compressed according to a known compression technique and if so compressing the data by that technique,
>     (b) if compression was not possible, and if the data consists of characters which are uniquely determined by 7 bits, treating the data as a 7 bit character string and stuffing the 7 bit character string into an 8 bit string,
>     (c) assigning a sub-channel number to data which is processed according to steps 2(a) or (b) or which has not been so processed,
> (3) assembling the message packet which incorporates
>     (a) framing information which includes bits which indicate whether the packet is control data or message data,
>     (b) information indicative of assigned sub-channel where the message is a data message, and
>     (c) the control data or
>     (d) the compressed, stuffed or unoptimised message data,
> (4) unpacking the packet from 8 bit bytes to form a 7 bit byte packet,
> (5) analysing [sic] the 7 bit byte packet to ascertain if it contains any prohibited

characters and if so substituting such prohibited characters with a suitable escape character and a complementary check character to produce the message packet for transmission.

'238 Patent at 14:41-15:3.[1]   The steps comprising claim 3 are

(1) if the received packet has a predetermined header and the receiver is configured to receive unmodified messages, then processing the packet as a modified packet according to steps (2) to (8), otherwise sending the packet to a user's application as an unmodified paging message,
(2) if the receiver is configured to receive only data information messages processing the packet according to steps (3) to (8),
(3) treating the packet as 7 bit characters and reconstituting any characters indicated by a predetermined flag,
(4) packing the 7 bit characters into 8 bit characters,
(5) checking a frame byte for type of packet and compression,
(6) decompressing the packet to data,
(7) validating the subchannel and if valid releasing security passing the data to an end user application, and
(8) if the message is a control message parsing and processing the control message.

*Id.* at 15:17-37.

The steps are clearly written in a logical order.  For instance, step (1) of claim 1 calls for analyzing a message.  Step (2) then assumes that the message has been analyzed to determine if it was a data message.  Furthermore, the substeps of step (2) follow the same logical progression requiring the "analysis" in step 2(a) before step 2(b) can be performed.  Similarly, step (1) of claim 3 refers directly to steps (2) to (8), indicating that it must be performed first.  This logically progressive language alone provides a strong indication that the steps must be performed in the recited order.  The specification provides further support for this conclusion.  The "summary of the invention" and the written description describe the precise order of steps recited in the claims.  *See id.* at 3:14-4:42, 5:14-7:23, 7:24-8:5.

---

[1] The parties agree that the substeps of step (3) can be performed in any order.

In fact, during the hearing, Sutton conceded that some of the steps must be performed in the order recited in the claims. However, it seems that the true dispute, rather than whether the steps must be performed in the recited order is whether each step must be fully completed before the next step takes place. In this regard Sutton argues that the claimed method is performed by a computer and "computers have the ability to readily manipulate and store data incrementally." Opening Claim Construction Brief, Docket No. 88 at 20. The specification describes the claimed methods operating on a "data stream." *Id.* at 14. Operations and steps are performed on "the data" within the "data stream" *Id.* at 20 ("[d]ata to be transmitted is analyzed"). There is no question that the steps of claim 1 and 3 must be performed on the "data stream" in the prescribed order. However, considering the nature of the invention and the specification, Sutton is correct that requiring an entire "data stream" to undergo a step before proceeding to the next would unduly limit the claims.

This view conforms with the claim language in that a computer must begin each step on the data stream before proceeding to the next step, and thus logically, each step will be complete on the entire data stream before the next step is complete on the entire data stream. Thus, in accordance with claim 3, step (3), a data packet will be created with all the data contained in a data stream before all the data within the packet is "unpacked" in accordance with step (4). Nothing in the specification requires that all data within a data stream form a packet before the first piece of data is "unpacked" from 8 bit bytes to 7 bit bytes. Thus, the order of the steps within the claims merely requires that each step must begin on a stream of data before the next step is begun.

*Nokia's motion for partial summary judgment regarding claim 3*

Nokia next moves for partial summary judgment on the invalidity of claim 3 because the claim is indefinite, fails to enable the invention under 35 U.S.C. § 112, and fails to disclose a useful

invention under 35 U.S.C. § 101. Nokia's primary argument is that, given that the steps of claim 3 must be performed in order, those steps cannot logically be performed. As this argument necessarily invokes primarily the enablement and utility requirements, the motion will primarily be determined on those standards.

"The enablement requirement is satisfied when one skilled in the art, after reading the specification, could practice the claimed invention without undue experimentation." *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 999 (Fed. Cir. 2008). "The scope of the claims must be less than or equal to the scope of the enablement to ensure that the public knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims." *Id.* The Federal Circuit has recognized the relationship between the enablement requirement of § 112 and the utility requirement of § 101. *CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1339 (Fed. Cir. 2003). Generally, if an invention is inoperable, then it will also fail the enablement requirement because a person skilled in the art would be unable to practice the invention. *See id.* Further, the utility requirement generally applies to impossible inventions. *Id.* Both indefiniteness for a lack of enablement and lack of utility must be proven by clear and convincing evidence. *See Sitrick*, 516 F.3d at 999.

The primary trouble occurs within steps (1) and (2) where the claim first requires that "if the received packet has a predetermined header and the receiver is configured to receive unmodified messages, then processing the packet as a modified packet according to steps (2) to (8) . . . ." '238 Patent at 15:17-20. The claim then requires in step (2), where it is assumed that the receiver is configured to receive unmodified messages, that "if the receiver is configured to receive only data information messages processing the packet according to steps (3) to (8) . . . ." *Id.* at 15:23-25.

Thus, the only way step (2) can ever be performed is if a "data information message" is a subset of an "unmodified message." However, the preamble of claim 3 itself differentiates "data information messages" from "unmodified messages" and "control messages." *See id.* at 15:6-15. Finally, if step 2 somehow is performed, it explicitly requires the performance of step (8), which in turn requires that "if the message is a control message parsing and processing the control message." *Id.* at 15:35-36. Again, step (8) cannot be performed if a receiver is configured only to receive "data information messages." There is a clear logical inconsistency within the claims.

Sutton responds that the inconsistency can be resolved by creating two classes of messages called "data information messages" and "unmodified messages." It then argues that a "control message" is a type of data information message so that step (8) can be performed even if a receiver is configured only to receive data information messages. However, these definitions fail to resolve how step (2) can be performed (requiring a receiver to receive only data information messages) when a determination has already been made that the receiver can receive unmodified messages. To resolve this logical inconsistency, Sutton essentially argues that step (2) is ignored because it has no logical alternative if its antecedent is not met. Thus, Sutton would read step (2) to mean that "if a receiver is configured to receive only data information messages" then "[process] the packet according to steps (3) to (8)," otherwise process the packet according to steps (3) to (8). This construction wholly ignores the existence of step (2) and is clearly impermissible.

Ultimately, Sutton's attempts to resolve the logical inconsistencies within claim 3 only creates more logical inconsistency or entirely rewrites the claim language. No matter what the construction, there is no scenario where the claim steps can be logically performed giving meaning to all the words used in the claim. The logical inconsistency would be most easily resolved by the

simple deletion of the word "only" from step (2). Though the inconsistency within claim 3 is likely the result of mere drafting error, courts are not permitted to rewrite claim language. *See Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008). Therefore, since it would be impossible for one skilled in the art to perform the steps of claim 3, the claim is invalid for lack of enablement and utility. Nokia's motion for summary judgment is granted.[2]

*"control message"*

Claim 1 contains the term "control message." Sutton defines the term as "information intended to reconfigure or manage characteristics of the receiving unit." Defendants urge that the definition is "information that is intended to reconfigure or manage characteristics of a receiving unit, and does not include a subchannel identifying byte." Thus, the central dispute is whether the term embodies a negative limitation that excludes information containing a subchannel identifying byte.

The specification expressly defines a control message by noting that such a message does not contain a subchannel identifier. When describing the transmission of particular types of messages the specification provides that "[i]f the data is an information packet and not a control packet a subchannel of 0-225 is assigned." '238 Patent at 5:58-59. Again, in a section specifically describing the different types of messages, the specification provides that "[u]nlike data messages, control messages use a different frame byte structure and do not include a subchannel indentifying byte." *Id.* at 9:20-23.

---

[2] As a result of this ruling it is unnecessary for the Court to construe the disputed terms within claim 3. However, as Claim 3 still constitutes part of the "intrinsic record," its terms and usages may be relied upon when construing other disputed terms within the patent. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861 (holding that a patent's claims constitute part of the intrinsic record).

Sutton responds to this persuasive intrinsic evidence by noting that the claims themselves do not expressly impose the negative limitation on a "control message." The argument misses the point. "The purpose of claim construction is to determine the meaning and scope of the patent claims asserted to be infringed." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (internal quotation marks omitted). Thus, terms that are expressly defined in the specification will generally be given that meaning. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication."). Thus, the fact that the patentee did not specify, in the claim itself, that a "control message" does not contain a subchannel identifier is not dispositive in light of the specification's express definitions.

Furthermore, Sutton's argument runs afoul of the maxim that claim language cannot enlarge what is patented beyond what the inventor described as the invention within the specification. *See Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1355 (Fed. Cir. 2006); *On Demand*, 442 F.3d at 1340. Accordingly, Nokia's definition is correct and "control message" is defined as "information that is intended to reconfigure or manage characteristics of a receiving unit, and does not include a subchannel identifying byte."

*"stuffing"*

Claim 1 contains the term "stuffing." During the hearing the parties agreed that "stuffing" means "placing the bits of a string of 7-bit characters into a string of 8-bit bytes and thus reducing the total number of bits."

*"sub-channel number" & "subchannel"*

Sutton suggests that "sub-channel number" means "a value representing a service type or

information path" and "subchannel" means "a service type or information path." Nokia urges that both terms should be defined as "one of the 256 addressable subdivisions of a receiver identification address." The central issues are whether a "subchannel" is limited to 256 subdivisions and whether the terms should be defined broadly as a "service type or information path" or more specifically as a "receiver identification address." The parties do not dispute that the term "number" used in claim 1 should have its ordinary meaning. Thus, the true term in dispute is "subchannel," and the term "subchannel number" as a whole does not necessitate a separate construction.

"Subchannel" is limited to 256 subchannels (0-255) in several locations within the patent. The specification explains that "[i]f a RIC channel is enabled to receive Data Messages, each message is assigned to one of the 256 subchannels within each logical channel." '238 Patent at 9:13-15. The specification further notes within the section entitled "summary of the invention" that the invention enables "accept[ing] or reject[ing] data information messages specified for a specific subchannel (0-255) for which the receiver respectively is or is not currently authorized to accept . . ." *Id.* at 3:62-65. At times, the range of subchannels is described differently, but the number of subchannel subdivisions consistently remains at 256. *See id.* at 4:26-29 ("the targeting of encoded or unencoded data packets to subsidiary addresses (1-256) at each network destination receiver identification code (RIC) address"). These are merely examples. As Nokia observes, the patent restricts the number of subchannel divisions to 256 in fifteen different locations. In fact, the preamble to claim 3 itself restricts the term "subchannel" to 256 divisions. *Id.* at 15:11-13 ("as well as being able to accept or reject data information messages specified for a specific subchannel (0-255)").

As discussed above, the preamble acts as a limitation on the claims themselves, furthermore

the specification clearly discusses a "subchannel" as having a range of 256 logical subdivisions. Sutton fails to identify any language either within the specification or the claims that suggest that a "subchannel" has a broader range. Additionally, the number of identifiable subdivisions that can logically be transmitted or received by an 8-bit byte is 256. Since the invention only pertains to transmitting and recieving 8-bit byte messages, limiting a subchannel to 256 subdivisions conforms with the context of the patent as a whole.

The specification further teaches that a "subchannel" pertains to subsidiary addresses recognized by a receiver. *Id.* at 3:62-65 ("data information messages specified for a specific subchannel (0-255) for which *the receiver* respectively is or is not currently authorized to accept . . . .") (emphasis added). The inventor explains that each "network destination" recognizes a "subchannel" or "subchannel number" as being an "address" corresponding to a particular "receiver identification code." *Id.* at 4:26-29. Again, Sutton provides no intrinsic or extrinsic evidence that supports defining a subchannel as a "service type or information path." While, generally, a "receiver identification address" may be a type of "information path," the inventor clearly uses the more specific definition when describing a "subchannel" for the purposes of the invention. Accordingly, "subchannel" is defined as "one of the 256 addressable subdivisions of a receiver identification address."

*"control data"*

The term "control data" appears in claim 1. The parties agreed at the hearing that the term means "data for a control message that is intended to affect or inquire of characteristics of a receiving unit."

*"prohibited characters"*

Claim 1 contains the term "prohibited characters." The parties agreed at the hearing that the term means "7-bit sequences whose transmission is arbitrarily prohibited by the messaging network." The parties further agreed that "arbitrarily" refers to an arbitrary selection of prohibited characters among various different messaging networks and not an ongoing arbitrary selection of prohibited characters within a single messaging network. Thus, within a single messaging network, the 7-bit sequences whose transmission is prohibited remains constant.

*"suitable escape character" & "complementary check character"*

Sutton suggests that "suitable escape character" means "an indication that special treatment is needed." Nokia contends that the term means "a 7-bit sequence used to indicate that a complimentary check character follows the sequence." Sutton contends that "complementary check character" means a "character whose value is relative to a known value" and Nokia urges the definition is "a 7 bit sequence representing a transformation of a prohibited character."

While the terms "suitable escape character" and "complimentary check character" never appear in the specification, within the context of the described invention, the purpose and function of those terms are clearly and narrowly defined. When describing the transmission of a message, the specification explains that a "data packet which is in 7 bit format must [] be 'treated' to enable those 7 bit characters which are prohibited from transmission by the network . . . to be transformed. A Transformation Escape Character (TEC) is configured be [sic] selected from the remaining available character set. This character is located in the data string. The TEC character is inserted at that location. A second character is also generated and inserted immediately following." '238 Patent at 6:57-67. The specification then explains that the "second character," or the character

following the "escape character," is a transformation of the prohibited 7-bit character. *Id.* at 6:65-7:14. A formula for transforming the prohibited 7-bit character and for choosing a TEC is provided. *Id.*

At the receiving end, the specification explains that the TEC is used to identify that the "second character" is a transformation of a prohibited 7-bit character. *Id.* at 7:47-50. The receiver then removes the transformations within the "second character" and deletes the TEC. *Id.* Thus, the original message is preserved without transmitting any prohibited 7-bit characters. Claim 1 refers to this process by replacing the terms "TEC" and "second character" with the terms "suitable escape character" and "complimentary check character." *See id.* at 14:66-15:3 ("analyzing the 7 bit byte packet to ascertain if it contains any prohibited characters and if so substituting such prohibited characters with a suitable escape character and a complimentary check character to produce the message packet").

There is no dispute that the above-quoted portion of the specification describes the process in claim 1 where the terms "suitable escape character" and "complimentary check character" are used. Rather, Sutton relies on general dictionary definitions and its own expert's testimony to urge broad definitions. Construing terms broadly based entirely on this sort of extrinsic evidence in the face of particular language within the specification is clearly improper under *Phillips*. Sutton's proposed definitions divorce the claim terms from the context of the patent. For instance, Sutton's definition of "suitable escape character" gives no indication what "special treatment" is indicated by an escape character when the process described above clearly explains the function and purpose of the claim term. Likewise, Sutton's proposed definition of "complementary check character" generally defines "complementary" without addressing the particular context with which the term

is used in the claims. The patent specifically describes, using the terms "TEC" and "second character," a process by which a 7 bit character (the "suitable escape character") is used to flag a transformed 7 bit character (the "complimentary check character") in order to avoid transmitting a prohibited character while retaining the original message. Accordingly, Nokia's proposed definitions are adopted, and "suitable escape character" is defined as "a 7-bit sequence used to indicate that a complimentary check character follows the sequence" and "complementary check character" is defined as "a 7 bit sequence representing a transformation of a prohibited character."

## CONCLUSION

For the foregoing reasons, the Court interprets the claim language in this case in the manner set forth above. Furthermore, Nokia's motion for summary judgment regarding claim 3 is **GRANTED** and Nokia's motion to strike is **DENIED**.[3] For ease of reference, the disputed claims are set forth in Appendix A and the Court's claim interpretations are set forth in Appendix B.

**So ORDERED and SIGNED this 10th day of August, 2009.**



_____
**LEONARD DAVIS
UNITED STATES DISTRICT JUDGE**

---

[3] In its motion to strike, Nokia provides no legal basis for striking an expert declaration attached to a claim construction brief. For this reason, the motion is denied. However, in fully considering Dr. Myler's declaration, the Court was ever mindful that conclusory and unsupported assertions are unhelpful and given very little weight when compared with the intrinsic record. *See Phillips*, 415 F.3d at 1317.

# APPENDIX A

*U.S. Patent No. 5,771,238*

1. A method of preparing a message packet for digital data transmission which enables eight bit data, binary data and **control messages** to be encapsulated in a 7 bit character packet where one or more of the 7 bit characters are prohibited comprising the steps of:

    (1) analysing a message to be transmitted to ascertain if it is a **control message** or a data message,

    (2) if a data message,

        (a) analysing it to determine if it can be compressed according to a known compression technique and if so compressing the data by that technique,

        (b) if compression was not possible, and if the data consists of characters which are uniquely determined by 7 bits, treating the data as a 7 bit character string and stuffing the 7 bit character string into an 8 bit string,

        (c) assigning a **sub-channel number** to data which is processed according to steps 2(a) or (b) or which has not been so processed,

    (3) assembling the message packet which incorporates

        (a) framing information which includes bits which indicate whether the packet is control data or message data,

        (b) information indicative of assigned **sub-channel** where the message is a data message, and

        (c) the control data or

        (d) the compressed, stuffed or unoptimised message data,

    (4) unpacking the packet from 8 bit bytes to form a 7 bit byte packet,

    (5) analysing the 7 bit byte packet to ascertain if it contains any **prohibited characters** and if so substituting such **prohibited characters** with a **suitable escape character** and a **complementary check character** to produce the message packet for transmission.

3. A method of receiving an incoming encoded binary message having packets transmitted over a paging network by a selective call receiver which enables the message receiver to receive at a single network address, unmodified paging messages and to selectively accept or reject eight bit data information messages and encoded control messages as well as being able to accept or reject data information messages specified for a specific subchannel (0-255) for which the receiver respectively is or is not currently authorised to accept; for each received packet of an incoming message the method comprising the steps of:

    (1) if the received packet has a predetermined header and the receiver is configured to receive unmodified messages, then processing the packet as a modified packet according to steps (2) to (8), otherwise sending the packet to a user's application as an unmodified paging message,

    (2) if the receiver is configured to receive only data information messages processing the packet according to steps (3) to (8),

    (3) treating the packet as 7 bit characters and reconstituting any characters indicated by a predetermined flag,

    (4) packing the 7 bit characters into 8 bit characters,

    (5) checking a frame byte for type of packet and compression,

    (6) decompressing the packet to data,

    (7) validating the subchannel and if valid releasing security passing the data to an end user application, and

    (8) if the message is a control message parsing and processing the control message.

## APPENDIX B

| U.S. Patent Nos. 5,771,238 ||
| --- | --- |
| **Disputed Claim Term** | **Court's Construction** |
| control message<br>Claim 1 | information that is intended to reconfigure or manage characteristics of a receiving unit, and does not include a subchannel identifying byte |
| character<br>Claim 1 | [AGREED] - a sequence of bits representing a value within a character set |
| data message<br>Claim 1 | [AGREED] - information intended for a particular application |
| uniquely determined by 7 bits | [AGREED] - only 7 bits are needed to represent each character in the data |
| stuffing<br>Claim 1 | [AGREED] - placing the bits of a string of 7-bit characters into a string of 8-bit bytes and thus reducing the total number of bits |
| sub-channel number & sub-channel<br>Claim 1 | one of the 256 addressable subdivisions of a receiver identification address<br>The term "number" requires no construction. |
| packet<br>Claim 1 | [AGREED] - a data structure having data for transmission in an electronic communications network |
| control data<br>Claim 1 | [AGREED] - data for a control message that is intended to affect or inquire of characteristics of a receiving unit |
| unoptimized<br>Claim 1 | [AGREED] - not compressed or stuffed |
| unpacking the packet from 8 bit bytes to form a 7 bit byte packet | [AGREED] - converting the packet from a series of 8-bit bytes to a packet that is structured as a series of 7-bit bytes |
| 7 bit byte packet | [AGREED] - packet that is structured as a series of 7-bit sequences |
| prohibited characters<br>Claim 1 | [AGREED] - 7-bit sequences whose transmission is arbitrarily prohibited by the messaging network |
| suitable escape character<br>Claim 1 | a 7-bit sequence used to indicate that a complimentary check character follows the sequence |

| | |
|---|---|
| complementary check character<br><br>Claim 1 | a 7 bit sequence representing a transformation of a prohibited character |